**AFFRIMED and Opinion Filed October 3, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-19-00635-CV
_____

### IN THE INTEREST OF R.H., A CHILD

---

**On Appeal from the 303rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-13-04823-V**

---

## MEMORANDUM OPINION
Before Justices Schenck, Osborne, and Reichek
Opinion by Justice Reichek

In this appeal, Father challenges the termination of his parental rights with respect to his biological son, R.H. Bringing three issues, Father contends the evidence is legally and factually insufficient to support (1) the ground for termination, (2) the finding that termination was in R.H.'s best interest, and (3) the appointment of the Texas Department of Family and Protective Services (the "Department") as R.H.'s sole managing conservator. We affirm the trial court's judgment.

### Factual Background

R.H. was born on December 15, 2005. At that time, Father and Mother were not living together, but Father was aware that R.H. had been born and knew that R.H. was his son. Father testified he saw R.H. a few times between 2005 and 2009.

In 2009, Father was convicted of the offense of capital murder and sentenced to death row. In 2013, the Texas Attorney General filed suit to establish Father's parentage of R.H. A blood test confirmed that Father was R.H.'s biological parent. The trial court signed a default order that

established the parent-child relationship between R.H. and Father, appointed Mother as R.H.'s managing conservator, and appointed Father as possessory conservator.

In November 2017, Dallas County Child Protective Services ("CPS") received a referral alleging physical abuse of R.H. Reports by the office of Court Appointed Special Advocates ("CASA") show that R.H. had cursed at his teacher and Mother was notified. When Mother arrived at the school, she was irate and hit R.H. in the face. Mother threatened R.H. stating "when you return home you better hope you make it out alive." Mother left R.H. at school stating he could no longer live in her home, but she returned later to retrieve him. When CPS interviewed R.H. the next day, he had marks and bruises on his back and bottom and scabs from previous whippings with an extension cord. R.H. told CPS he did not feel safe at home and his step-father slapped him and punched him in the face.

In December, the Department filed a motion to modify the prior order on the parent-child relationship and an original petition for the protection of R.H., conservatorship, and termination of both Mother's and Father's parental rights. Over the course of the next year, R.H. was placed in foster homes and a psychiatric hospital. He continued to struggle with his behaviors and, at one point, was hospitalized for putting a cord around his neck. Hospital records indicated that R.H. was allergic to a variety of foods and that he would intentionally eat these foods requiring the use of an EpiPen on multiple occasions. Although he was originally placed in a regular school while in foster care, he was transferred to an alternative school due to his behavior. R.H. was diagnosed with a depressive disorder "characterized by a combination of sever[e] and recurrent temper outbursts (verbal or physical) that are grossly disproportionate to the situation."

In October 2018, the trial court signed an order based on a mediated settlement agreement that returned R.H. to live with Mother on a monitored basis. The order stated that R.H., Mother, and R.H.'s step-father were required to participate in family counseling and R.H. would continue

individual counseling. R.H. was not allowed to reside in a room with any other minor children and Mother's younger son was to have a lock placed on his bedroom door. According to Wesley Hibbits, R.H.'s case worker, Mother installed a security system with cameras in every room and alarms on all the doors. R.H. was made to sleep in the living room.

Within about a month after the monitored return began, Mother brought R.H. back to CPS stating she feared for her life and her younger son's life and she could no longer handle R.H.'s behaviors. She said there were incidents at school every day that caused her to leave work and she was afraid she was going to lose her job. Mother requested R.H. be placed back in foster care and signed a voluntary affidavit relinquishing her parental rights. R.H. was placed in a residential treatment facility.

On May 1, 2019, the trial court conducted a bench trial on the Department's petition to terminate Mother's and Father's parental rights and to be appointed sole managing conservator of R.H. Mother did not appear at the hearing, but the court acknowledged Mother had signed a voluntary relinquishment of her parental rights. Hibbits testified that Father had been incarcerated since 2009 and there was no relationship or bond between Father and R.H.[1]

As to placement of R.H., Hibbits stated that R.H.'s maternal grandmother had a criminal history including a murder charge. Although Hibbits did not know if the Department had considered R.H.'s paternal grandmother as a placement for R.H., he stated that R.H. had accused the paternal grandmother's husband of sexually abusing him. R.H. had exhibited sexualized behavior against another foster child that led the Department to believe the abuse had occurred and reports stated R.H. was receiving therapy to address his sexual abuse issues as both a victim and offender.

---

[1] Hibbits initially stated incorrectly that Father had been sentenced to death for killing a police officer or fireman. Texas Department of Criminal Justice records admitted into evidence show that Father was convicted of killing two men during a home invasion. There is no indication that either victim was a police officer or fireman.

Reports from the residential treatment program showed that R.H. had a rough beginning, but was demonstrating improved behaviors. A CASA representative visited R.H. in February and said he appeared to be in good spirits and adjusting to his placement. R.H. told the representative that he "feels protected" at the facility. R.H. was receiving special education services for his behavior issues and he told the CASA representative he typically earned good grades in his classes. Hibbits stated R.H. had bonded with some of his caregivers and he respected them and treated them well. Both Hibbits and the CASA supervisor assigned to R.H. testified R.H. was doing well in his current placement and it was in R.H.'s best interest to terminate Mother's and Father's parental rights so that R.H. could eventually be placed in a foster or adoptive home.

Father appeared at trial and testified he was currently incarcerated because he had committed the offense of capital murder. Although he had an appeal of the conviction pending, he conceded that, even if it was successful, it would result only in his sentence being reduced to a life term in prison. Father further conceded his situation did not allow him to care for R.H. and he had not had any contact with R.H. in approximately ten years. Father stated he wanted to have some type of contact with R.H. in the future, however, "to be able to talk to him and give him some type of guidance." Father also stated he hoped R.H. could be placed with a family member. Father understood his mother was not being considered as a possible placement, but said she was no longer married to the man accused of sexually assaulting R.H. Father also understood that no appropriate member of Mother's family had come forward to care for R.H., but he suggested that two of Mother's relatives might be appropriate placements. Father did not know where either person lived or how to reach them.

After hearing the evidence, the trial court granted the Department's petition. The final decree terminated both Mother's and Father's parental rights and appointed the Department as R.H.'s sole managing conservator. The termination of Father's rights was based on section

–4–

161.001(b)(1)(Q) of the Texas Family Code which allows for involuntary termination of the parent-child relationship if the parent knowingly engages in criminal conduct that results in his conviction, confinement, and inability to care for the child for at least two years from the date the termination petition is filed. The court further found that termination of Father's parental rights was in R.H.'s best interest. Father brought this appeal.

## Analysis

### I. Standard of Review

In his first issue, Father contends the evidence is legally and factually insufficient to support the termination of his parental rights under section 161.001(b)(1)(Q) because the department failed to introduce any evidence that he "knowingly" engaged in criminal conduct or that he was a "parent" as defined by the family code at the time of the offense. A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence both that the parent committed an act or omission enumerated under family code section 161.001(b)(1) and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

Because the fundamental liberty interest of a parent in the care, custody, and control of his child is one of constitutional dimensions, involuntary parental termination must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). Our review of evidentiary sufficiency in these cases reflects the elevated burden of proof at trial. *In re Z.H.*, No. 05-17-01146-CV, 2018 WL 915029, at *3 (Tex. App.—Dallas Feb. 16, 2018, no pet.) (mem. op.). In reviewing legal sufficiency, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was

true.  *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and disregard all evidence a reasonable factfinder could have disbelieved or found to have been incredible.  *Id.*

In evaluating factual sufficiency, we consider all the evidence, including disputed or conflicting evidence, when considering whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations.  *Id.*  We must consider whether the disputed evidence is of such a nature that a reasonable factfinder could not have reconciled it in favor of its finding.  *In re N.T.* 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet*.*)*.*  If such evidence is so significant that the fact finder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient.  *Id.*   In applying this standard, we must be mindful not to scrutinize the evidence to the point where "the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

## II. Section 161.001(b)(1)(Q)

Father first challenges the sufficiency of the evidence supporting the trial court's finding that he "knowingly" engaged in criminal conduct as required by section 161.001(b)(1)(Q).  When asked at trial why he was incarcerated, Father responded, "I committed an offense of capital murder."  The offense of capital murder requires the offender's mental state be either knowing or intentional.  TEX. PENAL CODE ANN. § 19.02(b)(1), 19.03(a).  Proof that the defendant acted intentionally necessarily constitutes proof that he acted knowingly.  *Id*. § 6.02.  We conclude this evidence is both legally and factually sufficient to support the trial court's finding that Father knowingly engaged in criminal conduct.  *See V.A.C. v. J.L.W.*, No. 03-18-00202-CV, 2018 WL 4100798, at *3 (Tex. App.—Austin Aug. 28, 2018, pet. denied) (mem.op.) (conviction of offense

requiring mental state of knowing or intentional conduct sufficient to support finding that parent "knowingly" engaged in criminal conduct under subsection (Q)).

Father also contends that section 161.001(b)(1)(Q) requires the Department show he was a parent at the time he committed the offense. Father argues such evidence is lacking because he was not adjudicated as R.H.'s parent until 2013, four years after the offense occurred. Father's argument is without merit.

First, we note that Father testified he knew R.H. was his biological son at the time R.H. was born, which was four years before the offense was committed. The later adjudication simply confirmed R.H.'s parentage.

More importantly, nothing in the language of section 161.001(b)(1)(Q) requires the subject be aware of his status as a parent at the time of the offense, or even that the child be born before the offense occurs. *See In re A.O.*, No. 07-16-00331-CV, 2017 WL 877333, at *5 (Tex. App.—Amarillo Mar. 3, 2017, pet. denied) (mem. op.); *In re J.M.G.*, No. 07-16-00202-CV, 2016 WL 6471337, at *3 (Tex. App.—Amarillo Oct. 27, 2016, no pet.) (mem. op.). Subsection Q focuses on the parent's future imprisonment and inability to care for the child, not on the criminal conduct committed in the past. *In re A.V.*, 113 S.W.3d 355, 360 (Tex. 2003). It was undisputed at trial that Father was R.H.'s parent, that he would continue to be incarcerated for more than two years from the date of the petition, and that he was unable to care for R.H. In addition, Father failed to produce any evidence regarding how he would provide or arrange to provide care for R.H. while he was in prison. *See In re H.O.*, 555 S.W.3d 245, 251 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Accordingly, we conclude the evidence is legally and factually sufficient to support the trial court's finding that Father committed an act supporting termination of his parental rights under section 161.001(b)(1)(Q). We resolve Father's first issue against him.

### III. Best Interest

Father next contends the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent–child relationship between R.H. and Father was in R.H.'s best interest. A judicial determination of a child's best interest is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm. *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013). "Best interest" is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion. *Id*. The Texas Supreme Court has identified nine factors that may be considered in determining best interest: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These considerations are not exhaustive and the Department is not required to prove all of them as a condition precedent to terminating a parent's rights. *See In re C.H.*, 89 S.W.3d at 27. Evidence relating to a single factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child. *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.).

In this case, the Department presented evidence that R.H. had significant behavioral issues requiring a high level of supervision and treatment. He was participating in multiple forms of therapy and on medication. R.H. told CPS workers he did not feel safe in Mother's home and that he was physically abused by his step-father. R.H. further asserted he was sexually abused by

–8–

Father's step-father. Mother was both unable and unwilling to cope with R.H.'s behavioral issues, and she voluntarily terminated her parent-child relationship with R.H. Father stated he wanted to create a relationship with R.H., but he conceded he had no means to care for the child due to his lengthy incarceration for capital murder. During his ten years in jail, Father had no contact with R.H. Even before he was incarcerated, Father saw R.H. only a few times. Although Father suggested possible relatives as placements, none of the people he named were considered appropriate placements or had come forward to show any interest in caring for R.H.

In contrast, reports showed R.H. was doing well in the Department's residential treatment program and he was receiving the therapy and support he required. When speaking with a CASA representative, R.H. appeared "in good spirits" and stated he felt "protected" at the facility. R.H. received good grades in his special education program and testing indicated he would likely be able to complete grade level assignments with a typical level of difficulty. The CASA supervisor stated that R.H.'s behavior had improved while at the facility and, if the improvement continued, they hoped to place R.H. in a foster or adoptive home.

While there is a strong presumption that a child's best interest is served by maintaining the parent-child relationship, the prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *In re C.J.B.*, No. 05-19-00165-CV, 2019 WL 3940987, at *8 (Tex. App.—Dallas Aug. 21, 2019, no pet. h.) (mem. op.). It was undisputed that Father would not be able to care for R.H. from prison and he made no effort to support his son during his child's life. Father had no real plan as to how R.H. would be cared for if he maintained his parental rights. R.H. was happy and improving in the care of the Department and, if both Father's and Mother's rights were terminated, it was hoped that R.H. could be placed in a permanent home. We conclude the evidence in the record is legally and factually sufficient to

support the trial court's finding that termination of Father's parental rights was in R.H.'s best interest. *See In re C.H.*, 89 S.W.3d at 28. We resolve Father's second issue against him.

## IV. Conservatorship

In his final issue, Father contends the evidence is legally and factually insufficient to support the appointment of the Department as R.H.'s managing conservator. We review conservatorship determinations for an abuse of discretion and reverse only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Under this standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error, but are factors in assessing whether the trial court abused its discretion. *In re N.E.*, No. 05-15-00361-CV, 2015 WL 5244334, *13 (Tex. App.—Dallas Sept. 8, 2015, pet. denied).

Father argues the Texas Family Code creates a rebuttable presumption that a parent will be named the child's managing conservator unless the court finds that such appointment would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development or finds that there is a history of family violence involving the parents. *See* TEX. FAM. CODE ANN. § 153.131(a). As this Court has previously held, there is no authority for the proposition that this presumption applies to a parent whose parental rights have been terminated. *In re N.E.*, 2015 WL 5244334 at *14. Because we have already overruled Father's challenge to the termination of his parental rights, the trial court's appointment of the Department as sole managing conservator may be considered a consequence of the termination under section 161.207 of the family code. *Id.* Under section 161.207, once the court terminates the parent-child relationship with respect to both parents, the court must appoint a suitable competent adult, the Department, or a licensed child-placing agency as the child's managing conservator. TEX. FAM. CODE ANN. § 161.207(a).

Father contends he named other suitable adults as alternatives to the Department. The only alternative placements he discussed at trial, however, were his mother and two relatives of Mother. The paternal grandmother was discounted as a possible placement by the Department because of R.H.'s assertion that he was sexually assaulted by the grandmother's former husband while she was married to him. Father presented no evidence that his mother was an appropriate placement for R.H. or that she was willing and able to care for the child. There was also no evidence that either of the other two relatives named by Father had come forward to show interest in having R.H. placed with them and Father did not know where they lived or how to contact them. Despite this, Hibbits testified the Department would consider family members as a placement for R.H. even after Mother's and Father's rights were terminated.

Based on the foregoing, we conclude the trial court did not abuse its discretion in naming the Department as R.H.'s sole managing conservator. We resolve Father's third issue against him. We affirm the trial court's decree of termination.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

190635F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

IN THE INTEREST OF R.H., A CHILD

No. 05-19-00635-CV

On Appeal from the 303rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-13-04823-V.
Opinion delivered by Justice Reichek.
Justices Schenck and Osborne participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered October 3, 2019